# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

| | | |
|---|---|---|
| JOHNNY RAY OGLE, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| vs. | * | CV 505-011 |
| | * | |
| CURTIS JOHNSON, Warden, | * | |
| | * | |
| Respondent. | * | |

## ORDER

Before the Court is state prisoner Johnny Ray Ogle's federal habeas corpus petition.  In 1999, a jury in the Superior Court of Pierce County, Georgia, convicted Ogle of armed robbery.  The judge imposed a life sentence.  Ogle's conviction was affirmed on direct appeal, and his state habeas petition was denied.  Ogle v. State, 256 Ga. App. 26 (2002); State Habeas Order (Dkt. No. 13 Ex. 2).  In 2005, Ogle filed the instant federal petition.

## BACKGROUND

On Valentine's Day in 1998, a man armed with a silver

revolver robbed the Quick Change[1] convenience store in
Pierce County, Georgia.  H.T. 438, 512.  Kenneth Logan pled
guilty to the armed robbery, and on May 11, 1999, a Pierce
County jury determined that petitioner Johnny Ray Ogle had
aided and abetted that robbery.  H.T. 438, 577, 586.

The evidence authorized the jury to find that on
February 14, 1998, Ogle drove his truck to Logan's home,
where he picked Logan up.  H.T. 439-40.  Ogle and Logan
drove around for awhile.  Id.  They discussed robbing the
Quick Change.  H.T. 441.  They stopped by the store, and
Ogle went inside to "[s]cope it out."  H.T. 445.  He
purchased a small item and peeked inside the cash register
when the clerk rang up the sale.  H.T. 445-46.  After Ogle
returned to the truck, the men decided to rob the store.
H.T. 445.  Ogle gave Logan a ski mask, latex gloves, and a
revolver, then dropped him off by the front door.  H.T.
438, 439, 443-44, 446.  Logan went inside with the gun,
pointed it at the clerk, and took about $78 from the
register.  H.T. 396, 448.  Logan then called Ogle on a
handheld two-way radio, and Ogle picked him up.  H.T. 447-

---

[1] The Quick Change was also known as "Lairsey's," and some witnesses referred
to it by that name.  H.T. 387, 395, 441.

48, 452.  Ogle and Logan split the money.  H.T. 448.  After
hearing this evidence, the jury convicted Ogle of aiding
and abetting an armed robbery.  H.T. 577, 586.

The case's procedural path has not been simple.  After
his trial, Ogle requested and received new appointed
counsel, who filed a motion for a new trial.  After the
trial court rejected the new trial motion, the newly
appointed attorney assisted Ogle with his direct appeal.
The Georgia Court of Appeals affirmed Ogle's sentence.
Thereafter, Ogle filed a *pro se* state habeas corpus
petition.  In 2004, the Superior Court of Telfair County,
Georgia, denied that petition.

Ogle then presented his habeas claims in federal court.
The original petition alleged ineffective assistance of
appellate counsel, ineffective assistance of trial counsel,
prosecutorial misconduct, and unfair factfinding by the
state habeas court.  The ineffective assistance of
appellate counsel claim had eight subparts.  Habeas Pet.
(Dkt. No. 1).  On November 14, 2005, the Magistrate Judge
issued a report and recommendation dismissing all of Ogle's
Claims.  (Dkt. No. 19).  On December 9, 2005, Judge William

T. Moore, Jr., of the Southern District of Georgia entered
an order adopting the Magistrate Judge's Report and
Recommendation and dismissing all of Ogle's claims.  Moore
Order (Dkt. No. 23); First Rpt. & Rec. (Dkt. No. 19).

By adopting the Report and Recommendation, the District
Court's Order dismissed all eight of Ogle's ineffective
assistance of appellate counsel sub-claims on the ground
that Ogle had not presented them to the state habeas court
and had therefore not exhausted his state remedies as
required by 28 U.S.C. § 2254(b)(1)(A).  First Rpt. & Rec. 6
(Dkt. No. 19).  The Order dismissed Ogle's remaining claims
on a variety of other grounds.

The Eleventh Circuit granted a certificate of
appealability solely on the ineffective assistance of
counsel claims.  Ogle v. Johnson, 488 F.3d 1364, 1368
(2007).  On June 15, 2007, the Eleventh Circuit reversed
and remanded Judge Moore's order.  Id. at 1371.  The
Eleventh Circuit disagreed with the District Court's order
in two respects.  First, contrary to the District Court,
the Eleventh Circuit held that only one of Ogle's eight
sub-claims regarding the ineffective assistance of

4

appellate counsel was unexhausted. _Id._ at 1368-70. The other seven were ripe for federal review. _Id._ Second, the Eleventh Circuit wrote that if, upon remand, the district court concluded that Ogle's petition lacked merit, the district court should deny the petition with prejudice instead of dismissing it. _Id._ at 1371.

On May 1, 2008, the case was reassigned to the undersigned. (Dkt. No. 38). On September 24, 2008, the Magistrate Judge issued a new report and recommendation. Second Rpt. & Rec. (Dkt. No. 39).


## DISCUSSION

This Court finds the reasoning of the Report and Recommendation that the Magistrate Judge presented to Judge Moore persuasive as to all of Ogle's claims except as to those claims concerning the ineffective assistance of appellate counsel. _See_ First Rpt. & Rec. (Dkt. No. 19). The Court therefore adopts the reasoning of the Magistrate Judge's report and recommendation to Judge Moore as the opinion of this Court with regard to petitioner's claims of ineffective assistance of trial counsel, prosecutorial

misconduct, and unfair factfinding by the state habeas court. See First Rpt. & Rec. (Dkt. No. 19). However, instead of dismissing Ogle's claims of ineffective assistance of trial counsel, prosecutorial misconduct, and unfair factfinding by the state habeas court, this Court **DENIES** them with prejudice. See Ogle, 488 F.3d at 1371. The Court will address Ogle's claims regarding the effectiveness of his appellate counsel anew.

Ogle specifies eight occasions on which his appellate counsel's performance allegedly dipped below constitutional minimums. According to Ogle, appellate counsel's performance was constitutionally deficient because appellate counsel failed to raise the following issues on direct appeal:

> (1) comments during trial by the prosecutor and two witnesses on Ogle's post-arrest silence,
>
> (2) the prosecutor's alleged failure to reveal a plea bargain with Ogle's co-defendant, a witness for the state,
>
> (3) Ogle's co-defendant's allegedly false statement that he had not struck a deal with the state,
>
> (4) the absence of Ogle or Ogle's counsel at his arraignment,
>
> (5) the injection of the prosecutor's personal opinion

in closing argument,

(6) the use of an allegedly falsified affidavit to procure a search warrant,

(7) the Superior Court's refusal to accept Ogle's *pro se* motion, and

(8) trial counsel's failure to subpoena the receipt for the weapon allegedly used in the robbery.

## I.  STANDARD OF REVIEW

The standard by which a federal district court reviews a claim for habeas corpus depends on whether the claim has already been presented to a state habeas court and whether the state habeas court addressed the merits of that claim. If a state inmate filing a federal habeas claim has not presented the claim to a state habeas court, then the claim is "unexhausted" and, ordinarily, the federal court should dismiss it so that the petitioner may bring the claim before a state tribunal.  Rose v. Lundy, 455 U.S. 509, 510 (1982).  However, if it is clear that a state court, upon being presented with the exhausted claims, would deem them procedurally defaulted, then the federal court should deny the unexhausted claims with prejudice.  Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317, 1351 (11th Cir. 2004).

Denying the claims with prejudice, as opposed to merely dismissing them, furthers judicial economy by avoiding "needless judicial ping-pong" between state and federal courts. Mize v. Hall, 532 F.3d 1184, 1191 n.5 (11th Cir. 2008) (citing Ogle, 461 F.3d at 1370).

If the habeas petitioner has presented his claims to a state habeas court, and the state habeas court has addressed those claims on the merits, then the federal habeas court reviews the state court's rulings with substantial deference. Under 28 U.S.C. § 2254(d), a federal court will disturb a state habeas court's decision on the merits only if the petitioner shows that the decision was contrary to, or involved an unreasonable application of, clearly established constitutional law as determined by the United States Supreme Court, or if the decision rested upon an unreasonable factual determination. § 2254(d); Prince v. Vincent, 538 U.S. 634, 641 (2003); Jones v. Walker, 540 F.3d 1277, 1288 (11th Cir. 2008). A state habeas court's ruling that a claim is procedurally defaulted precludes federal review of that claim unless the petitioner "can demonstrate cause for the default and

actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 729-32, 750 (1991); accord House v. Bell, 547 U.S. 518, 536 (2006).

Habeas petitioners have one avenue to non-deferential federal review of their claims: if a petitioner has presented a claim to a state habeas court, but the state court did not address it, then a federal district court will address the claim *de novo.* Cone v. Bell, 129 S.Ct. 1769, 1784 (2009).

In sum, if a habeas petitioner has not presented his claims to a state habeas court and it is unclear whether a state court would find those claims procedurally defaulted, then a district court should dismiss the claims. Rose, 455 U.S. at 510. If the petitioner has not presented his claims to a state court, and it is clear that a state court to which those claims were presented would find them procedurally defaulted, then a district court should deny them with prejudice. Kelley, 377 F.3d at 1351. If the state habeas court addressed the petitioner's claims on the

merits, a district court reviews the state court's holdings
with substantial deference.  § 2254(d).  If a state court
deemed a petitioner's claim procedurally defaulted, federal
review is barred unless the petitioner can satisfy the
cause-and-prejudice or miscarriage-of-justice tests.
Coleman, 501 U.S. at 729-32, 750.  If the petitioner has
presented his claims to the state habeas court, but the
state court failed to rule on them, then a district court
reviews those claims *de novo*.  Cone, 129 S.Ct. at 1784.

Ogle alleges eight ways in which his appellate counsel
provided ineffective assistance.  One of those eight claims
was not presented to the state habeas court, so this Court
will review it only if Ogle can meet the cause-and-
prejudice or miscarriage-of-justice test with regard to
that claim.  See Coleman, 501 U.S. at 729-32, 750.  Of the
seven claims that Ogle did present to the state habeas
court, three were ruled upon.  Ogle, 488 F.3d at 1368-69.
This Court will review those three claims with the
deference prescribed by § 2254(d).  The remaining four of
Ogle's claims have slipped between Scylla and Charybdis:
they were raised before the state habeas court, but were

not ruled upon.  Ogle, 488 F.3d at 1370-71.  This Court

will review those claims *de novo*.[2]  Cone, 129 S.Ct. at 1784.


II.  OGLE'S CLAIMS

To establish that an appellate lawyer's performance was
ineffective under the Sixth Amendment, a petitioner must
make two showings.  First, the petitioner must show that
counsel's performance was unreasonable "under prevailing
professional norms."  Strickland v. Washington, 466 U.S.
668, 687, 688 (1884); see also Matire v. Wainwright, 811
F.2d 1430, 1435 (11th Cir. 1987) (Strickland standard
applies to trial and appellate counsel).  There is a
"strong presumption" that counsel's decisions were
reasonable.  Strickland, 466 U.S. at 689; Wisenhant v.
Allen, 556 F.3d 1198, 1203 (11th Cir. 2009).  In assessing
counsel's decisions, courts should avoid the distorting

---

[2] Counsel for the Warden argues that the issues raised in the state habeas
court, but not addressed in the state court's order, were "implicitly decided
adversely to Petitioner."  Warden's Supp. Br. in Supp. of Answer-Response 7
(Dkt. No. 35).  Counsel for the Warden then advises this Court to "defer to
those implicit findings."  Id.  This Court rejects counsel's invitation to
defer to implicit findings.  Binding law clearly states that when a state
habeas court does not address an issue presented to it, a district court
should review that issue *de novo*.  Cone 129 S.Ct. at 1784; Espy v. Massac,
443 F.3d 1362, 1365 (11th Cir. 2006).  If federal courts deferred not only to
explicit findings, but also to what counsel for the Warden describes as
"implicit findings," then the *de novo* review that Cone, Espy, and sundry
other cases contemplate could not exist.  See also Rompilla v. Beard, 545
U.S. 374, 390 (2005); Romine v. Head, 253 F.3d 1349, 1365 (11th Cir. 2001).

effects of hindsight by evaluating those decisions from counsel's perspective at the time. Magwood v. Culliver, 555 F.3d 968, 976 (11th Cir. 2009). Failure to raise meritless arguments will not render counsel's performance ineffective. Diaz v. Sec'y for Dep't of Corr., 402 F.3d 1136, 1142 (11th Cir. 2005). Raising every nonfrivolous argument is not a prerequisite to rendering constitutionally effective assistance -- it is not only permissible, but often advisable, for an advocate to focus on the few strongest arguments instead of raising every nonfrivolous issue. Jones v. Barnes, 463 U.S. 745, 750-54 (1983).

Second, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 687, 694. Courts require this showing of actual prejudice because the right to counsel exists not for its own sake, but only because it is sometimes necessary to ensure a fair trial. Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 1240 (2002). If deficiencies in a lawyer's performance do not

affect the outcome of a proceeding, the result of the proceeding was not unfair and no constitutional violation has occurred.  Id.

The Court will address each of Ogle's eight claims that his appellate counsel was ineffective.


### 1.  Comments on Post-Arrest Silence

Ogle points to five occasions during his trial on which a witness or lawyer commented on Ogle's post-arrest silence.  Habeas Transcript (hereinafter "H.T.") 507, 523, 525 (twice), 571.  The first and second comments occurred during the direct examination of separate witnesses for the state, the third and fourth occurred during the defense's cross examination of one of the state's witnesses, and the fifth occurred during the prosecutor's closing argument. An excerpt providing the content and context of each comment is reprinted below.

First, during the state's direct examination of Detective Smith:

> Q    Do you recall in your presence did Mr. Ogle make any utterance?  Did he make a statement to Mr. Ponsell?

> A     Yes sir, he, Jody, or Agent Ponsell[3]
> mirandized him and from what I can remember he
> took the warrant and was reading the warrant
> and he said he wasn't going to give a
> statement but he wanted to know what time the
> robbery occurred and Mr. Ponsell told him the
> approximate time and Mr. Ogle said he was an
> hour, approximately an hour away from the
> scene when it occurred.

H.T. 507.

Second, during the state's direct examination of Agent

Ponsell:

> Q     And my understanding was [that Ogle] made an
> utterance and a statement to you?
>
> A     Yes sir that's correct.
>
> Q     What did that concern?
>
> A     Mr. Ogle, I served the warrant on Mr. Ogle at
> the Pierce County Jail. I advised him that he
> was being charged with the armed robbery at
> Lairsey's Convenience Store, also known as
> Quick Change. He stated that he did not wish
> to make a statement to me at the time and then
> asked me, he said I have one question for you
> and I said what's that, and he said what time
> is this armed robbery supposed to have
> occurred. I told him it was about eight-
> thirty, approximately eight-thirty p.m. At
> that time he said I was over an hour's drive
> away at the time of the armed robbery.

H.T. 523.

Third and fourth, during the defense's cross

_____

[3] "[H]e," "Jody," and "Agent Ponsell" all refer to the same person, Agent Jody
Ponsell.

examination of Mr. Ponsell:

> Q   . . . Did you say it was your policy to give a Miranda waiver to people who are in custody right?
>
> A   That's correct.
>
> Q   Where's Johnny Ogle's Miranda waiver?
>
> A   Johnny Ogle didn't give a statement.
>
> Q   He was in custody, wasn't he?
>
> A   Yes ma'am, and I asked him about taking a statement from him and he stated he didn't want to give a statement, so there would be no use to advise him of that if you're not going to take a statement.

H.T. 525.

Fifth, during the prosecutor's closing argument:

Okay now, July the 2nd, they start looking, they find Mr. Ogle, I think it was July the 21st I believe is the date they said they picked him up. July the 21st, he doesn't want to talk, that's his right, didn't want to talk to them. But he's reading the warrant, isn't that what Agent Ponsell said he's reading the warrant, Ogle's reading the warrant. The warrant says around 8:30. And Ogle says wait a minute that couldn't have been me, I was an hour away at 8:30. Enough, again, we know that's a bald faced lie, because he was there at 8:05 on the tape. What did Ogle not know? Ogle didn't figure that he was on the tape apparently. And if you look, I'm going to play the video again . . .

H.T. 571.

15

In order to establish that his appellate counsel was ineffective for failing to argue that the comments on Ogle's post-arrest silence violated the Constitution, Ogle must first show that failing to raise these issues was unreasonable "under prevailing professional norms." Strickland, 466 U.S. at 687, 688. Then, Ogle must show a reasonable likelihood that prejudice resulted from his attorney's error. Id. at 687, 694.

Ogle made this argument to the state habeas court, and the state court rejected it. Ogle, 488 F.3d at 1368-69; State Habeas Order 9-10 (Dkt. No. 13 Ex. 2). This Court will review the state court's decision with the deference prescribed by § 2254(d). See Jones, 540 F.3d at 1288.

A defendant's post-arrest silence may be used against him in some circumstances, but not in others. In the seminal case of Doyle v. Ohio, the United States Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. 610, 619 (1976); see also Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Impermissible use during trial of a defendant's post-arrest silence has become known as "Doyle error." See, e.g., Brecht v. Abrahamson, 507 U.S. 619, 622-29, 631, 636, 639 (1993); Hill v. Turpin, 135 F.3d 1411, 1417-19 (11th Cir. 1998). A prosecutor commits Doyle error if he impeaches a defendant by referring to the defendant's post-arrest, post-Miranda-warning silence. Brecht, 507 U.S. at 628-29. However, no Doyle error occurs if a prosecutor "comment[s] on a defendant's silence if it occur[s] prior to the time that he is arrested and given his Miranda warnings." United States v. Rivera, 944 F.2d 1563, 1569 (11th Cir. 1991). Further, in this Circuit, "the government may comment on a defendant's silence when it occurs after arrest, but before Miranda warnings are given." Id.; accord United States v. O'Keefe, 461 F.3d 1338, 1346, 1347 (11th Cir. 2006); United States v. Valencia, 169 Fed. Appx. 565, 575 (2006).

Here, on each of the occasions to which Ogle directs the Court's attention, the references at trial to Ogle's silence refer to the period immediately following Ogle's arrest. See H.T. 507, 523, 525 (twice), 571. By the time

to which the comments refer, then, Ogle had already been arrested. If Ogle had also been Mirandized, then references to his silence could violate Doyle. See Brecht, 507 U.S. at 628-29. If Ogle had not been Mirandized, however, then references to his silence would not violate Doyle. O'Keefe, 461 F.3d at 1346, 1347; Rivera, 944 F.2d at 1567.

The record indicates that Ogle was probably not Mirandized. Detective Smith, who worked for the Pierce County Sheriff's office, testified in passing that Agent Jody Ponsell had Mirandized Ogle.[4] H.T. 507. However, Agent Ponsell himself subsequently explained -- at some length -- that he had not read Ogle his Miranda rights.[5]

---

[4] The exchange during Officer Smith's direct examination went as follows:

Q    Do you recall in your presence did Mr. Ogle make any utterance? Did he make a statement to Mr. Ponsell?

A    Yes sir he, Jody, or Agent Ponsell [ i.e., Agent Jody Ponsell] mirandized him and from what I can remember he took the warrant and was reading the warrant and he said he wasn't going to give a statement but he wanted to know what time the robbery occurred and Mr. Ponsell told him the approximate time and Mr. Ogle said he was an hour, approximately an hour away from the scene when it occurred.

H.T. 507.

[5] The exchange during Agent Ponsell's cross examination went as follows:

Q    . . . Did you say it was your policy to give a Miranda waiver to people who are in custody right?

A    That's correct.

18

H.T. 525-26. Agent Ponsell then explained that, as a matter of custom, he did not advise a person about his Miranda rights when that person declined to give a statement because doing so would be unnecessary. H.T. 526. Because Ogle had declined to give a statement, Agent Ponsell said, he did not read Ogle his Miranda rights. H.T. 525-26.

Both parties appear to agree that the officers did not read Ogle his Miranda rights. Nowhere does Ogle assert that he received Miranda warnings. In fact, on direct appeal and in his motion for a new trial, Ogle argued that the statement he made to Agent Ponsell (i.e., that he was an hour away when the robbery occurred) should not have come into evidence because Agent Ponsell had not advised Ogle of his Miranda rights. Def.'s Br. on Dir. App. 8-9 (Dkt. No. 13 Ex. 4); Def.'s Br. in Supp. of Am. Mot. for

---

Q    Where's Johnny Ogle's Miranda waiver?

A    Johnny Ogle didn't give a statement.

Q    He was in custody wasn't he?

A    Yes ma'am, and I asked him about taking a statement from him and he said he didn't want to give a statement, so there would be no use to advise him of that if you're not going to take a statement.

H.T. 525.

New Trial (H.T. 359). The state seemed to agree that there was no Miranda warning -- in response to Ogle's argument, the state argued that Ogle's statement was properly admitted as a spontaneous utterance, but did not argue that the Miranda warning had been given. State's Br. on Dir. App. 8-11 (Dkt. No. 13 Ex. 4). Aside from Officer Smith's passing reference on direct examination, the Court has found no indication anywhere in the record that Ogle received a Miranda warning, and has found multiple indications that he did not. H.T. 525-26 (Agent Ponsell's cross examination); Def.'s Br. on Dir. App. 8-9.

Even where a record is inconclusive as to whether the defendant received a Miranda warning, the Eleventh Circuit has held that a prosecutor may refer to a defendant's silence without violating Doyle. In United States v. O'Keefe, the defendant, who had been operating a child pornography website, was convicted under federal child pornography laws. 461 F.3d at 1340. His primary defense was that he was actually an anti-child-pornography crusader attempting to entrap child predators. Id. at 1341. At trial, the government sought to rebut the "crusader"

defense by arguing that the crusader storyline had been concocted for trial, and adduced evidence that the defendant had never claimed to be an anti-child-pornography crusader at any time before opening statements.  Id. at 1341-45.  The government mentioned the defendant's pretrial silence as to his status as a crusader on three occasions, including during its cross examination of the defendant. Id.  While under cross examination, "[the defendant] admitted that he never told [the investigating officer] on the day of the search or any time thereafter that he was a private citizen trying to expose child pornography."  Id. at 1342.

If the silence to which the government referred had occurred after the defendant's arrest and after he received Miranda warnings, the references might have constituted Doyle error.  See id. at 1345.  But the O'Keefe court wrote that "[a]lthough [the defendant] argues that he probably received Miranda warnings during his arraignment hearing, he fails to point us to any portion of the record which indicates that this is true."  Id. at 1347.  In sum, "the

record [did] not reveal whether [the defendant] was ever read his Miranda rights." Id.

Because the defendant could not show that the silence to which the government referred at trial followed the reading of Miranda warnings, the Eleventh Circuit held that no Doyle error occurred. The court wrote, "[b]ecause there can be no Doyle violation until after a person is given Miranda warnings and the assurances implicit therein, and there is no evidence before us which indicates that O'Keefe received such warnings, we conclude that no Doyle violation occurred in this case." Id. at 1347. Therefore, O'Keefe stands for the proposition that when the record "does not reveal whether [the defendant] was ever read his Miranda rights," references to a defendant's silence do not violate Doyle. Id.

Here, the record indicates that Ogle probably did not receive Miranda warnings before the period of silence to which both parties referred at trial. H.T. 525-26 (Agent Ponsell's testimony); Def.'s Br. on Dir. App. 8-9. If Ogle did not receive Miranda warnings, there was no Doyle violation. O'Keefe, 461 F.3d at 1346, 1347; Rivera, 944

F.2d at 1567. Even if the record is inconclusive with regard to the reading of Miranda rights, the result is the same: there was no Doyle violation. O'Keefe, 461 F.3d at 1347. Therefore, the Court concludes that no Doyle violation occurred.[6]

Ogle relies on Matire v. Wainwright for the proposition that the references to his post-arrest silence were impermissible. Obj. to First Rpt. & Rec. 3, 13 (Dkt. No. 21); Obj. to Second Rpt. & Rec. 10 (Dkt. No. 41); see Matire, 811 F.2d 1430 (11th Cir. 1987). Although the Matire court held that the government's references to the defendant's post-arrest silence were unconstitutional, Matire is distinguishable because the silence to which the government referred at trial occurred after the defendant had been advised of his Miranda rights. Id. at 1432.

Because no Doyle violation occurred in this case, appellate counsel's decision not to raise the Doyle issue

---

[6] The rule applied in Rivera and O'Keefe -- that silence can be used against a defendant if officers do not give a Miranda warning -- may seem disquieting because it appears to give law enforcement officers an incentive to defy Miranda. But the rule applied in Rivera and O'Keefe only applies to the admissibility of a defendant's silence, not his statements. O'Keefe, 461 F.3d at 1346, 1347; Rivera, 944 F.2d at 1567. Therefore, although officers' refusal to read Miranda rights could make a defendant's silence admissible, it would still render a defendant's responses to officers' questions inadmissible, thereby defeating the ostensible purpose of interrogation. Miranda, 384 U.S. at 444.

was reasonable.  See Diaz, 402 F.3d at 1142 (counsel not
ineffective for failing to raise meritless argument).
Counsel was not ineffective under Strickland.  See
Strickland, 466 U.S. at 688.  In rejecting Ogle's argument
to the contrary, the state habeas court neither misapplied
constitutional precedent nor relied on unreasonable factual
determinations.  See State Habeas Order 9-10 (Dkt. No. 13
Ex. 2); § 2254(d).  Therefore, this Court will not disturb
the state court's ruling.  § 2254(d).  Ogle's first
argument that his appellate counsel provided ineffective
assistance fails.[7]

2.  Prosecutor's Failure to Reveal Sentencing
    Agreement

Ogle alleges that the assistance rendered by his
appellate counsel was ineffective because counsel did not
argue that the prosecutor failed to disclose the sentencing
agreement between the state and Kenneth Logan, Ogle's co-

---

[7] Ogle does not argue to this Court that the failure to advise him of his
Miranda rights violated the Constitution.  He did make that argument on
direct appeal, however, and the Georgia Court of Appeals rejected it.  Ogle,
256 Ga. App. at 28.  The court noted that Ogle's statement that he was an
hour away when the robbery occurred was a spontaneous utterance, not a
product of interrogation, and therefore concluded that the absence of Miranda
warnings did not render Ogle's statement inadmissible.  Id.

defendant and a witness for the state.  At the time of Ogle's trial, Logan had already pled guilty to armed robbery, but had not yet received his sentence.  Logan's Plea Tr. 6 (Dkt. No. 1 Ex. 1); Logan's Sent. Tr. (Dkt. No. 1 Ex. 2); H.T. 39, 66-67, 74-75, 438, 456-57.  The prosecutor agreed to recommend that Logan receive a ten-year sentence if Logan testified against Ogle, but did not promise that the judge would impose any particular sentence.  Logan's Sent. Tr. 1, 3; see H.T. 42-43, 62, 64, 66-67, 73-78, 277, 621, 632, 639; see also State Habeas Order 8 (Dkt. No. 13 Ex. 2).  Ogle's trial counsel knew about the agreement and discussed it with Ogle.  H.T. 77.

As the Eleventh Circuit has noted, the state habeas court addressed this issue.  Ogle, 488 F.3d at 1368-69; State Habeas Order 8-9, 12.  Applying the Strickland standard, the state habeas court rejected Ogle's claim that appellate counsel's decision not to raise nondisclosure of the sentencing agreement rendered her performance constitutionally deficient.  State Habeas Order at 8-12.  Under § 2254(d), this Court will defer to the state court's holding unless that court applied Strickland unreasonably,

contravened United States Supreme Court precedent, or based its decision on an unreasonable factual finding.

The state habeas court's conclusion was plainly reasonable. Ogle has not shown that the prosecutor failed to disclose the agreement; to the contrary, as Ogle concedes and the record reveals, both Ogle and his trial counsel knew about the agreement. Habeas Petition at 3-4 (Dkt. No. 1); H.T. 62, 77. Ogle argues, however, that "[i]t is the duty of the Prosecuting Attorney to inform the Jury, not Trial Counsel." Habeas Petition at 4.

Throughout his filings with the Court, Mr. Ogle's logic has been crisp and his citations accurate. On this point, however, Ogle is mistaken -- a prosecutor's duty to disclose runs not to the jury, but to the defendant. See United States v. Ruiz, 536 U.S. 622, 623 (2002) ("[T]he Fifth and Sixth Amendments provide, as part of the Constitution's 'fair trial' guarantee, that *defendants* have the right to receive exculpatory impeachment material from prosecutors" (emphasis added)) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)); Brown v. Chaney, 469 U.S. 1090, 1094 (1984) ("It is well settled that in certain

circumstances a prosecutor is required to disclose exculpatory evidence *to a defendant*." (emphasis added)); United States v. Hamaker, 455 F.3d 1316, 1327 (11th Cir. 2006) (describing Brady as "establishing a pretrial government duty to disclose *to defendant* all evidence material to guilt or punishment" (emphasis added)); Davis v. Terry, 465 F.3d 1249, 1254-55 (11th Cir. 2006) (no Brady violation occurred where state's witness requested leniency in return for testimony because defense counsel knew about witness's request, even though evidence about witness's request was not presented to jury).

Here, the state did not fail to disclose its deal with Logan to Ogle. H.T. 76-77. Instead, the state served the deal on Ogle's lawyer, who strategized with Ogle about the best way to cross examine Logan regarding the deal. H.T. 62, 76-77, 632. Therefore, the state's treatment of Logan's plea deal did not violate Brady.[8] Because there was

---

[8]     Ogle cites Allen v. State, a Georgia Court of Appeals case, for the proposition that a prosecutor must tell the jury about any sentencing agreements it reaches with witnesses testifying for the state. 128 Ga. App. 361 (1973); see Resp. to Warden's Supp. Br. at 13 (Dkt. No. 36). As a state court decision, Allen does not bind this court. Nevertheless, as Ogle correctly notes, Allen interprets a United States Supreme Court case, Giglio v. United States, to mean that "evidence of any understanding or agreement as to future prosecution of an accomplice, on whose testimony the state's case almost entirely depends, is relevant to his credibility; the jury is entitled to know of it; the prosecutor has a duty to disclose it . . ." Allen, 128

no violation of Brady, the trial court's determination that Ogle's appellate counsel was not constitutionally obligated to raise the Brady issue was reasonable. See State Habeas Order 8-9, 12.

Nor did the state court's holding contradict any United States Supreme Court precedent. The cases Ogle cites, Giglio v. United States and Napue v. Illinois, are both distinguishable on the ground that, in those cases, the prosecution failed to disclose exculpatory information to the defendant before trial. Giglio, 405 U.S. 150 (1972); Napue, 360 U.S. 264 (1959). Here, in contrast, the prosecutor disclosed the deal to Ogle's counsel, who discussed the deal with Ogle. H.T. 62, 76-77, 632.

In deciding that Ogle's appellate counsel need not have argued that the state withheld information about Logan's

---

Ga. App. at 363-64; see Giglio, 405 U.S. 150 (1972). This Court does not disagree with Allen's interpretation of Giglio. However, contrary to Ogle's contentions, Allen does not interpret Giglio to require prosecutors to inform the jury, as opposed to the defendant, about any agreements the state reaches with its witnesses.

The Allen court mentioned a prosecutor's duty to disclose, but did not specify to whom that duty ran. In fact, as this Court has already noted, the duty runs to the criminal defendant, not the jury. See Ruiz, 536 U.S. at 623. Although one clause in the foregoing quotation from Allen mentions the jury, that clause establishes only that evidence of the state's agreements with testifying witnesses may be brought before a jury by a properly situated party, not that the prosecutor has an affirmative constitutional duty to tell the jury about any such agreement. These propositions are analytically distinct, and Allen stands only for the former.

plea deal, the state habeas court did not unreasonably apply the law, rely on unreasonable factual determinations, or contravene United States Supreme Court precedent. See State Habeas Order 8-12. Therefore, pursuant to § 2254(d), this Court will not disturb the state court's ruling. Ogle's second argument that his appellate counsel provided ineffective assistance fails.


### 3.   Co-Defendant's Denial of Existence of Sentencing Agreement

Ogle alleges that his appellate counsel rendered ineffective assistance by failing to argue that Logan perjuriously denied the existence of his sentencing agreement with the state. Ogle protests that the prosecutor's failure to rectify that allegedly false testimony violated his due process rights under Napue. See 360 U.S. at 269. The state habeas court did not address this issue, so no deference need be applied under § 2254(d). See Cone, 129 S.Ct. at 1784.

As noted above, there was a plea agreement between Logan and the state. In return for Logan's testimony against Ogle, the state agreed to recommend that Logan

receive a sentence of ten years imprisonment on a separate offense on which Logan and Ogle were also co-defendants. Logan's Sent. Tr. 1, 3 (Dkt. No. 1 Ex. 2); H.T. 62, 64, 66-67, 73-78, 277, 621, 632, 639; see also State Habeas Order 8 (Dkt. No. 13 Ex. 2).  The record indicates that, although the state struck this deal with Logan in the context of another criminal case pending against Logan, the deal was designed to cover several charges then pending against him.  Logan's Sent. Tr. 3; H.T. 64, 80, 277.  One of those charges covered by the deal was the robbery of the Quick Change in which Ogle was convicted of having participated.  H.T. 64, 80, 277.  Logan pled guilty the day before Ogle's trial, and was sentenced the day after. Logan's Sent. Tr. 3; H.T. 39, 74-75, 438, 456-57.  Logan's deal depended on testifying against Ogle.  H.T. 42, 73-75.

The plea agreement with Logan came up on five occasions at trial.  It came up for the first time during the state's direct examination of Logan.  The transcript reads:

Q   How much money did you get out of this
    robbery?

A   I don't know about thirty dollars I think.

Q   Okay, now you've pled guilty, have you been
    sentenced yet?

A   No.

Q   And this is your lawyer right here I think in
    the seats isn't it, Mr. Eaves, he's here with
    you today?

A   Mr. Eaves yeah.

Q   You asked him to come over and he came over
    here.

A   Yeah.

Q   And we're supposed to go to a sentencing
    hearing on you is that right?

A   Yes sir.

Q   Mr. Eaves explained to you, has he explained
    to you what kind of sentence you're probably
    going to get?

[objection from defense counsel made and
 overruled]

A   No sir.

Q   You're going to the big house aren't you?

A   Yes sir, I'm already there.

Q   And we just haven't, the court just hasn't
    decided on how many years we're talking about
    isn't that right?

A   Far as I know yes sir.

H.T. 456-67.

When Ogle's trial counsel cross examined Logan immediately after the state's direct examination, she returned to the plea agreement. The transcript says:

Q    Okay. Have you ever heard the term substantial assistance?

A    No, you want to explain it?

Q    Okay. Has it been explained to you that you need, needed to come and testify against Mr. Ogle in order to complete your sentencing deal? And that's part of your deal?

A    Why?

Q    Because I believe you have a reason for testifying here today. Could you tell us what that is?

A    Ain't it the right thing to do?

Q    It's the right thing to do, okay. Will this be the same judge that sentences you?

A    I don't know. Ain't you gotta ask him that?

H.T. 458. Ogle's trial counsel then moved to a different subject. Id.

In the state's redirect of Logan, the prosecutor returned to the plea agreement. First, however, the prosecutor asked about a written confession that Logan had signed on July 2, 1998, well before he made his plea deal with the state in December of 1998. H.T. 76, 277, 466,

524.  The written confession stated that Ogle had given Logan the gun, mask, and gloves that he used during the robbery; that Ogle had entered the store about fifteen minutes before Logan to "look over the store;" that Ogle had dropped Logan off to rob the store; and that Ogle had picked Logan up after the robbery when Logan summoned Ogle on a handheld two-way radio.  H.T. 448-53.  During redirect examination, the state came as close as it ever got to a denial that the plea agreement existed.  The colloquy went as follows:

> Q    Alright, well let me ask you this, had anybody made you any deal on July the 2nd, 1998 [i.e., the date of Logan's written confession]?
>
> A    Did they?
>
> Q    Well I'm asking you, you wrote out and told them all this, this is what you testified to.
>
> A    No, I think I was just coming down off that dope and all and that I felt bad about what I did.
>
> Q    Okay.  Well what I'm saying is do you and I have a deal right now on what you'll be sentenced to?
>
> A    No, like you said I don't even know your right name, I still don't know your name.  I just up here doing the best I can, remember what all I can remember and that's it.

H.T. 466-67.

Both sides then mentioned the plea agreement in closing arguments. Ogle's counsel argued that:

> [Logan] admitted that he hadn't been sentenced yet and I can bet you that coming to this trial is going to have a little something to do with how many years he gets. That will be up to your Honor.

H.T. 560.

Not long thereafter, the prosecutor commented on Logan's upcoming sentencing during his closing argument. The prosecutor said:

> I suggest to you we have proven this case. What gain is there to Kenny Logan? He's got to stand before this Judge and make his own peace. He and his lawyer have got to ask for a sentence. There's no package deal, Kenny Logan's not getting probation, Kenny Logan is going to prison, Kenny Logan knows he's going to prison. Yes sir, he's trying to help himself out. Well you know but he confessed in full with a three page written statement. He's on tape. There ain't a whole lot he can do.

H.T. 574.

If the state convicted Ogle by presenting false testimony about Logan's sentencing deal, Ogle's conviction must fall as a violation of due process. Napue, 360 U.S. 269; Giglio v. United States, 405 U.S. 150, 155 (1972).

"It is of no consequence that the falsehood [bears] upon the witness' credibility rather than directly upon defendant's guilt." Napue, 360 U.S. at 269. If a witness for the government presents false evidence, the prosecutor must correct the witness if the prosecutor knows, should know, or subsequently comes to know that the evidence is false. Id.; Ford v. Hall, 546 F.3d 1326, 1331-32 (11th Cir. 2008). A prosecutor's duty not to knowingly present false evidence is related to, but conceptually distinct from, the prosecutor's duty to reveal exculpatory evidence to the defense. See Brown v. Wainwright, 785 F.2d 1457, 1464 (11th Cir. 1986) (describing both duties). Since Giglio, false denials of plea agreements by government witnesses have become known as "Giglio error." See, e.g., McClesky v. Zant, 499 U.S. 467, 473 (1991); Ford, 546 F.3d at 1331.

If the government presents evidence that it knows to be false, the defendant is entitled to a new trial if that evidence was "material." Giglio, 405 U.S. at 154; Brown, 785 F.2d at 1465-66. In the context of false testimony, the test for materiality asks whether "the false testimony

could in any reasonable likelihood have affected the judgment of the jury." Giglio, 405 U.S. at 154. The "any reasonable likelihood" test for materiality of testimony regarding a witness's plea deal sets a lower bar for materiality than the "reasonable probability" standard that governs more general Brady claims.[9] Ventura v. Attorney General, Fla., 419 F.3d 1269, 1282 (11th Cir. 2005); see also United States v. Agurs, 427 U.S. 97, 103 (1976). The Giglio standard does not require a defendant to show that correction of the testimony "probably would have resulted in acquittal." Brown, 785 F.2d at 1463.

Here, Logan's testimony on redirect bordered on false. The prosecutor asked Logan, "do you and I have a deal on what you'll be sentenced to?" H.T. 467. Logan replied, "No, like you said I don't even know your right name, I still don't know your name. I just up here doing the best I can, remember what all I remember and that's it." Id.

---

[9] The Eleventh Circuit has written that the "any reasonable likelihood" standard for Giglio claims is equivalent to the "harmless beyond a reasonable doubt" standard from Chapman v. California, 386 U.S. 18, 24 (1967). Ford, 546 F.3d at 1332 (2008 panel decision in habeas case). It is unclear whether the Chapman and Giglio standards are actually equivalent, however, because an earlier Eleventh Circuit decision compared the Giglio standard for materiality to the Chapman standard and concluded that, after Brecht v. Abrahamson, 507 U.S. 619 (1993), "Chapman . . . has little application to a case before us on collateral review." Ventura v. Attorney General, Fla., 419 F.3d 1269, 1279 n.4 (11th Cir. 2005).

This was the closest that the state came to presenting false testimony.

But the testimony was not false. The prosecutor asked if there was a deal on what Logan "would be sentenced to." Id. Although the state had agreed to recommend ten years of incarceration, the deal was for a recommendation by the state, not a sentence by the court. Logan's Sent. Tr. 1, 3; Logan's Plea Tr. 6 (Dkt. No. 1 Ex. 1); H.T. 277. Therefore, Logan's response that there was no deal as to what he "would be sentenced to" was truthful.

Furthermore, after reading the transcript of Logan's direct examination, cross examination, and redirect, one is left with the distinct impression that Logan was a layperson who lacked a sophisticated understanding of the legal proceedings going on around him. He lived with his parents and did lawn work around town. H.T. 440. He seemed, at times, not to understand the direction in which the prosecutor was trying to take his testimony. See, e.g., H.T. 442-47. He was a crack user. H.T. 460. In closing arguments, the prosecutor said to the jury, "I'm sorry [Logan] [i]s kind of dim." H.T. 567. Although the

state's case hung largely on Logan's testimony -- in the prosecutor's words, "he said some things pretty doggone crucial" -- the prosecutor further remarked that Logan was "dumb as a skunk," "may be firing on five or six cylinders," and said, "I don't think he could plan a menu at McDonald's." Id.

When Logan replied to the prosecutor's question regarding the existence of a plea deal by saying "I don't even know your right name," it does not necessarily follow that Logan was being evasive. See H.T. 467. The record indicates that Logan had actually reached his plea agreement with a different assistant district attorney than the one actually conducting the redirect examination. H.T. 277. Logan may not have recognized that both the prosecutor asking him questions and the person with whom he had struck an agreement six months before were representatives of the same office, and that the prosecutor standing before him was bound by the agreement Logan had reached with a different lawyer. So when the prosecutor asked, "do you and I have a deal . . .?" and Logan replied, "[n]o . . . I don't even know your right name," Logan

likely thought that the question asked after the existence of a deal struck between him and the person asking the question. See H.T. 467. Logan had not struck a deal with that person. H.T. 277. Under that understanding, therefore, "no" was the correct answer. See H.T. 277.

Furthermore, to the extent that Logan's response on redirect indicated to the jury that no agreement existed, other evidence and argument indicated the opposite. On direct examination, Logan testified that he had pled guilty to the robbery but had not yet been sentenced, that he knew he was going to prison, and that the court had yet to determine for how many years he would be imprisoned. H.T. 456-57. On cross examination, Ogle's counsel asked -- although she did not receive a meaningful response from Logan -- "[h]as it ever been explained to you that you need, needed to come and testify against Mr. Ogle in order to complete your sentencing deal?" H.T. 458. In closing arguments, Ogle's trial counsel argued that "coming to this trial is going to have a little something to do with how many years [Logan] gets." H.T. 560. Finally, in the state's closing argument, the prosecutor reminded the jury

that Logan would have to stand before "this Judge" and ask for his own sentence.  H.T. 574.  "Yes sir, [Logan] [i]s trying to help himself out," the prosecutor said.  Id.

Because Logan's testimony was not false, and because the evidence and argument at trial did not falsely indicate that no plea deal existed, no Giglio error occurred.

Whether Giglio error occurred, however, is not the precise question before this Court.  The precise question is whether Ogle's appellate counsel was ineffective for failing to argue that Giglio error occurred.  Two additional considerations, apart from the non-occurrence of Giglio error, indicate that failing to make an argument under Giglio did not make appellate counsel's performance ineffective.

First, because trial counsel did not object to Logan's allegedly perjurious testimony, appellate counsel would have had to raise the Giglio issue by asserting that trial counsel was ineffective for failing to object when Logan testified -- perjuriously, according to Ogle's allegations -- about his deal.  Appellate counsel did raise an ineffectiveness claim, but did not include trial counsel's

failure to make a Giglio objection as a ground for that ineffectiveness. See Appellant's Br. on Dir. App. 10-14 (Dkt. No. 13 Ex. 4). The reason appellate counsel omitted the Giglio issue, according to appellate counsel's testimony at the state habeas hearing, was that she believed trial counsel had a good reason for not drawing the jury's attention to Logan's plea agreement: not bringing evidence of Ogle's other criminal troubles before the jury. H.T. 62, 66. Logan's plea agreement involved not only the armed robbery for which Ogle was tried, but also separate charges against Logan on which Ogle was also a co-defendant. H.T. 64, 80, 277. In not focusing on the plea agreement, Ogle's trial counsel avoided alerting the jury to the other criminal charges pending against Ogle. H.T. 62, 66. Appellate counsel believed that trial counsel's decision not to emphasize Logan's plea deal was reasonable because emphasizing Logan's deal would have "dirtied [Ogle] up." H.T. 62.

Second, even if Logan's testimony regarding his plea agreement was perjurious, it might not have been material. See Giglio, 405 U.S. at 154 (discussing materiality

requirement). From the existence of Logan's deal with the state, the jury could reasonably have inferred that Logan had an incentive to implicate Ogle. But the state introduced -- and focused on -- Logan's written confession from July of 1998, which predated the plea deal that Logan struck in December. H.T. 76, 277, 448-52, 524. That prior written confession contained substantially all of the testimony that the state needed to convict Ogle. See H.T. 448-52. Therefore, even if the jury believed that Logan would be inclined to stretch the truth in order to consummate his sentencing deal, the written confession from July 1998 would have confirmed the veracity of his testimony because Logan signed it before striking his deal. It is doubtful, therefore, that there exists "any reasonable likelihood" that clearer testimony about Logan's deal with the state would have swayed the jury. See Giglio, 405 U.S. at 154.

Because no Giglio error occurred, the Court concludes that Ogle's appellate counsel was not constitutionally ineffective for failing to raise Giglio on appeal. See Diaz, 402 F.3d at 1142 (counsel not ineffective for failing

to raise meritless argument). The Court's conclusion is
further supported by the apparent reasonableness of Ogle's
trial counsel's decision not to dwell on the Logan deal,
and the doubtful materiality of the testimony about the
deal. Ogle's third argument that his appellate counsel was
ineffective fails.


### 4.  Absence at Arraignment

Ogle alleges that his appellate counsel was ineffective
because counsel did not argue that the absence of Ogle and
his attorney from Ogle's arraignment warranted reversal.
The state habeas court did not rule on this issue, although
Ogle presented it, so this Court addresses the issue *de
novo*. Ogle, 488 F.3d at 1369-70.

The record reveals that Ogle's trial counsel waived
arraignment by signing a document that acknowledged service
of the indictment, acknowledged service of the state's
witness list, and expressly "waive[d] formal indictment."
H.T. 340 (waiver); see also H.T. 19-20, 630-31. Trial
counsel entered a plea of not guilty in accordance with
Ogle's wishes. H.T. 19-10. Georgia law authorizes a

criminal defense lawyer to waive formal arraignment with or without the presence of the defendant.  Loggins v. State, 225 Ga. App. 713, 714 (1997); Davis v. State, 135 Ga. App. 302, 205-06 (1975) (superseded by statute on other grounds as recognized by 295 Ga. App. 590).  Allowing waiver of arraignment does not violate due process.  Garland v. Washington, 232 U.S. 642, 645 (1914).

There is, as Ogle points out, authority for the proposition that a criminal defendant has a right to counsel at arraignment.[10] Michigan v. Jackson, 474 U.S. 625, 626 (1986); Hamilton v. Alabama, 368 U.S. 52, 54-55 (1961); Conklin v. Schofield, 366 F.3d 1191, 1201 (11th Cir. 2004); see also O'Kelley v. State, 278 Ga. 564, 567 (2004) (addressing defendant's initial appearance, and mentioning arraignment).  However, because arraignment was validly waived in this case, formal arraignment never occurred.  See H.T. 340.  Therefore, there was no opportunity for the Sixth Amendment right to counsel to attach, or be violated, during arraignment proceedings.

---

[10] Whether an accused has a constitutional right to counsel at all arraignments, or only at arraignments in states where the arraignment constitutes a "critical stage" of the proceedings, is not perfectly clear. See Hamilton v. Alabama, 368 U.S. 52, 54-55 (1961).  The Court expresses no view on that subject.

Because arraignment did not occur, the cases cited above concerning the right to counsel at arraignment are distinguishable. In Jackson and Hamilton, the defendants were arraigned without counsel. Jackson, 475 U.S. at 627; Hamilton, 368 U.S. at 53 n.3. The occurrence of arraignment in those cases makes them distinguishable. Arraignment proceedings were not at issue in Conklin, so the Eleventh Circuit's reference to arraignment in that case was dicta, and there are no factual circumstances to compare with the facts of this case. See Conklin, 366 F.3d at 1201. O'Kelley involved a defendant's initial appearance (though not his arraignment) before a magistrate judge. O'Kelley, 278 Ga. at 564. The defendant asked for a lawyer, but was subsequently interrogated by detectives outside the presence of an attorney, and the court held that the results of that interrogation should be suppressed under the Sixth Amendment. Id. at 564-65, 568. Here, the record reveals no proceeding at which Ogle was unrepresented and requested an attorney and no subsequent questioning by law enforcement officers that could have violated Ogle's Sixth Amendment rights. Therefore,

O'Kelley is inapposite.

Ogle alleges that his trial counsel did not waive the arraignment herself, but instead asked another lawyer to go to the courthouse and sign trial counsel's name for her. See H.T. 19, 628. Trial counsel testified that she was initially unsure whether she would be able to make it to the courthouse in time to sign Ogle's arraignment waiver because she had business in another courthouse in another county that morning, and that she asked a friend of hers to "sign [her] name" in the event that she could not make it. H.T. 19, 628. In the motion for a new trial on December 19, 2001, trial counsel was initially unable to recall whether she signed Ogle's waiver, or whether someone else had "sign[ed] [her] name" for her. H.T. 629. After reviewing the waiver with her signature on it, however, trial counsel recalled that she had signed the waiver herself. H.T. 630-31. She affirmed that she signed the document herself in the state court's habeas hearing on April 10, 2003. H.T. 19. This Court concludes that the waiver was valid. See Loggins, 225 Ga. App. at 714.

Because trial counsel validly waived arraignment, Ogle's Sixth Amendment right to counsel at arraignment was not violated. Therefore, appellate counsel was not ineffective for failing to raise the arraignment issue on appeal. See Diaz, 402 F.3d at 1142 (counsel not ineffective for failing to raise meritless argument). Ogle's fourth argument that his appellate counsel provided ineffective assistance fails.

### 5. Injection of Prosecutor's Personal Opinion

Ogle alleges that his appellate counsel was ineffective for failing to argue that the prosecutor impermissibly injected his personal opinion into the state's closing argument when the prosecutor attacked Ogle's credibility. Although Ogle lumps these alleged constitutional deficiencies into one subpart of his habeas petition, he actually presents two arguments: first, that the prosecutor impermissibly attacked Ogle's credibility, and second, that the prosecutor impermissibly injected his personal opinion into the state's closing argument. Both of Ogle's

arguments are based on the following passage from the prosecutor's argument:

> I don't think the truth's in [Ogle].  You couldn't
> squeeze him up and get truth to drip out.  It just
> ain't there.

H.T. 563.  The Court will address Ogle's two arguments separately.

First, the state habeas court did not address Ogle's argument that the Constitution forbade the prosecutor's attack on Ogle's credibility.  <u>See</u> State Habeas Order (Dkt. No. 13 Ex. 2).  Therefore, this Court will address the constitutional propriety of attacking Ogle's credibility *de novo*.  <u>Cone</u>, 129 S.Ct. at 1784.

When, in a criminal case, the defense attacks the credibility of the government's witnesses, the government may respond by attacking the credibility of any witnesses who testify for the defense.  <u>United States v. Eley</u>, 732 F.2d 1522, 1526 (11th Cir. 1984); <u>United States v. Bright</u>, 630 F.2d 804, 824 (5th Cir. 1980).  This rule applies to a testifying defendant, because "when a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness."  <u>Portuondo v.</u>

Agard, 529 U.S. 61, 69 (2000). Therefore, where the defense attacks the credibility of the government's witnesses in closing arguments, and the defendant has testified, the government may respond by attacking the defendant's credibility. Id.

Here, Ogle testified. See H.T. 529-51 (Ogle's testimony). Then, in summation, Ogle's trial counsel attacked Kenneth Logan's credibility by reminding the jury that Logan had used crack and that Logan had a sentencing deal with the state. H.T. 560. Because Ogle testified and Ogle's attorney attacked Logan's credibility, the state was authorized to attack Ogle's credibility in its closing argument. Portuondo, 529 U.S. at 69.

Because the prosecutor's attack on Ogle's credibility was permissible, direct appeal on that issue would have been futile. Therefore, Ogle's trial counsel is not ineffective for having failed to raise that issue. See Diaz, 402 F.3d at 1142 (counsel not ineffective for failing to raise meritless argument).

Second, Ogle alleges that his appellate counsel should have argued that the prosecutor impermissibly injected his

personal opinion into the state's closing argument. Ogle presented this argument to the state habeas court, and the state court rejected it. State Habeas Order 10; Ogle, 488 F.3d at 1368-69. This Court will not disturb the state court's ruling unless it was based on an unreasonable factual finding, contravened United States Supreme Court precedent, or involved an unreasonable application of law clearly established by the United States Supreme Court. § 2254(d).

The state habeas court made a factual finding that "[a]ppellate counsel also [saw] no basis on which to allege that the prosecutor had impermissibly injected personal opinion into his closing argument, as prosecutors have wide latitude in closing and she did not see any impermissible comments." State Habeas Order 10. This finding was based on appellate counsel's testimony that she knew about the prosecutor's reference to his personal opinion, but she did not raise the issue on appeal because "wide latitude is given in closing arguments and certainly closing arguments are not evidence." H.T. 60. The state habeas court's factual finding as to appellate counsel's reason for not

raising this issue on appeal was reasonable, and therefore does not merit overturning the state court's holding.  See § 2254(d)(2).

The next question is whether the state habeas court's order runs afoul of United States Supreme Court precedent. Ogle's argument that the prosecutor improperly injected his personal opinion into his closing argument is based on the following passage (reprinted above):

> I don't think the truth's in [Ogle].  You couldn't squeeze him up and get truth to drip out.  It just ain't there.

H.T. 563.  In addition to the sentences about which Ogle complains, the prosecutor offered a further personal opinion when discussing the credibility of Brandy Stewart, a witness that the state called but whose testimony proved advantageous to Ogle.  Stewart had previously signed a statement implicating Ogle, but she renounced that statement at trial.  H.T. 476-81.  In closing argument, the prosecutor said:

> [Stewart] swears under oath in that chair that [she and Ogle] never once talked about this case. *I guarantee you* they had this little ole statement of hers, they've probably been through this thing so many times they worried, worried the xerox off the paper . . .

51

H.T. 574-75 (emphasis added).

The United States Supreme Court has established that a prosecutor "must refrain from interjecting personal beliefs into the presentation of his case." United States v. Young, 470 U.S. 1, 8-9 (1985). However, not all references by a prosecutor to his personal beliefs merit habeas relief. A prosecutor's improper comments do not violate the Constitution unless they "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."[11] Donnelly v. DeChristoforo, 416 U.S. 637, 643, 645 (1974); accord Darden v. Wainwright, 477 U.S. 168, 181 (1986). Therefore, Ogle is not entitled to habeas relief on this ground unless he can show that, under law clearly established by the United States Supreme Court, the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643; Prince, 538 U.S. at 641 (burden rests with petitioner).

---

[11] Although the United States Supreme Court has not elaborated on the "infected the trial" test, the Eleventh Circuit has held that the test is met "when there is a reasonable probability that, but for the prosecutor's offending remarks, the outcome of the proceeding would have been different." United States v. Eyster, 948 F.2d 1196, 1206-07 (11th Cir. 1991).

Ogle has named no United States Supreme Court case that calls the state habeas court's holding into doubt. To the contrary, the high court's cases support the state habeas court's decision. In Donnelly, the prosecutor made two comments during his closing arguments that, like those of the prosecutor in this case, referred to his personal views. 416 U.S. at 640. First, the prosecutor said, "I honestly and sincerely believe that there is no doubt in this case, none whatsoever." Id. n.6. Second, the prosecutor said, "[the defendant and his counsel] said they hope that you find [the defendant] not guilty. I quite frankly think that they hope you find him guilty of something a little less than first-degree murder." 416 U.S. at 640. After reviewing these remarks, the Court applied the "infected the trial" test and wrote, "we simply do not believe that this incident made [the defendant's] trial so fundamentally unfair as to deny him due process." Id. at 643, 645.

Here, as in Donnelly, the prosecutor referred to his personal views on two occasions during closing arguments. The personal views that the prosecutor expressed in this

case were no more egregious than those expressed in Donnelly. Although the prosecutor's reference to his personal views during summation in this case was improper under Young, it is far from clear that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process" under Donnelly. See Donnelly, 416 U.S. at 643; Young, 470 U.S. at 8-9. Therefore, the state habeas court did not unreasonably apply or contravene United States Supreme Court precedent when it determined that Ogle's appellate counsel was not ineffective for failing to argue this issue on appeal. See State Habeas Order 10; Diaz, 402 F.3d at 1142 (counsel not ineffective for failing to raise meritless argument).

Because the state habeas court did not rely on an unreasonable factual determination, or contravene or unreasonably apply clearly established United States Supreme Court precedent, this Court will not disturb its holding. See § 2254(d)(1). Ogle's fifth argument that his appellate counsel provided ineffective assistance fails.

## 6. Use of Falsified Affidavit to Obtain Search Warrant

Ogle alleges that Agent Ponsell, a witness for the state, used a falsified affidavit to obtain a search warrant for the home of Teresa Ogle, where authorities discovered a revolver allegedly used in the robbery of the Quick Change. Ogle claims that his appellate counsel's failure to raise this issue of the falsified affidavit rendered her legal assistance ineffective. The state habeas court did not address this issue, so this Court reviews it *de novo*. Cone, 129 S.Ct. at 1784; see Ogle, 488 F.3d at 1369-70.

The thrust of Ogle's argument is that the revolver was obtained in violation of the Fourth Amendment, and therefore should have been excluded at trial. See Mapp v. Ohio, 367 U.S. 643, 655 (1961). Generally, habeas relief cannot be predicated on unreasonable searches or seizures by the state unless the petitioner was deprived of a "full and fair" opportunity to litigate his Fourth Amendment claims. Stone v. Powell, 428 U.S. 465, 494 (1976). The Supreme Court has held that a habeas petitioner may raise a Fourth Amendment claim through the prism of ineffective

assistance of counsel, however, and may be entitled to relief if the attorney's failure to raise a Fourth Amendment issue below meets the two-prong test of Strickland. Kimmelman v. Morrison, 477 U.S. 365, 382-83 (1986). Therefore, Ogle's claim is cognizable.

Ogle is also correct to note that some discrepancy exists between the affidavit Agent Ponsell supplied in order to obtain a search warrant and his subsequent trial testimony. In the warrant affidavit, Ponsell attested that a video recording from the convenience store that Ogle allegedly robbed contained images of the revolver. H.T. 235-38. According to the warrant affidavit, Ponsell described the revolver pictured in the video to Brandy Stewart, who knew Ogle. Id. Stewart allegedly told Ponsell that a revolver matching that description could be found in Teresa Ogle's home, and Agent Ponsell then swore out the affidavit upon which the Pierce County Magistrate Court relied in issuing the search warrant. Id. At trial, however, Agent Ponsell testified that she had not seen or heard of the revolver until she took Stewart's statement.

H.T. 524. Agent Ponsell's trial testimony thus failed to account for the video that her warrant affidavit described.

This is not a huge discrepancy, and it does not conclusively establish that the affidavit that Agent Ponsell provided to the Magistrate Judge was falsely sworn. The discrepancy could have been attributable to something as innocuous as a lapse of memory -- Agent Ponsell took Stewart's statement on July 1, 1998, and Ogle's trial did not begin until May 11, 1999. H.T. 236, 383, 524. This relatively minor discrepancy does not compel the conclusion that law enforcement officers violated the Constitution in obtaining the revolver. See Herring v. United States, 129 S.Ct. 695, 703 (2009) ("[A]llegations of negligence or innocent mistake are insufficient.").

Furthermore, Ogle's Fourth Amendment argument fails because the challenged search implicated the Fourth Amendment rights of Teresa Ogle, not Petitioner Johnny Ogle. The search occurred in Teresa Ogle's home at a time when Johnny no longer lived there, and resulted in the seizure of a handgun that belonged to Teresa. H.T. 235, 412, 527-28 (Johnny did not live with Teresa at the time of

the search); H.T. 413, 535 (the gun belonged to Teresa).

Because the search did not involve Johnny Ogle's property

or place of abode, it did not implicate Johnny's Fourth

Amendment rights, even though the fruits of the search were

used against him.  Rakas v. Illinois, 439 U.S. 128, 134

(1978).  Defendants may not assert the Fourth Amendment

rights of others.  Id. at 133-34; Peabody v. State, 156 Ga.

App. 853, 853 (1980).  Therefore, even if the search that

produced the revolver was illegal, the argument that Johnny

Ogle was entitled to have the gun excluded was meritless.

Because the argument was meritless, Ogle's appellate

counsel was not ineffective for failing to make it.  Diaz,

402 F.3d at 1142 (counsel not ineffective for failing to

raise meritless argument).  Ogle's sixth argument that his

appellate counsel provided ineffective assistance fails.


7.   The Superior Court's Refusal to Accept Ogle's *Pro
     Se* Petition

Ogle alleges that his appellate counsel was ineffective

for failing to argue that the trial court erred by not

accepting the *pro se* brief that Ogle composed and offered.

However, Ogle has not procedurally exhausted this claim, so

the Court will not consider it unless Ogle can meet the cause and prejudice test or show that his continued incarceration would constitute a miscarriage of justice. Ogle, 488 F.3d at 1370; House v. Bell, 547 U.S. 518, 536 (2006); see § 2254(b)(1)(A).

Ogle bears the burden of meeting the cause and prejudice test. Bousley v. United States, 523 U.S. 614, 622 (1998). He has not shown "cause" -- i.e., he has not provided a reasonable explanation of why he did not argue, before the state habeas court, that appellate counsel's assistance was made ineffective by her failure to argue that the trial court's rejection of Ogle's *pro se* brief warranted reversal. See Coleman, 501 U.S. at 749-50. Although Ogle has asserted that he has satisfied the cause and prejudice test, he has shown no valid reason for his failure to raise this issue before the state habeas court. See Pet.'s Rebuttal to Respondent's Ans.-Resp. 5-6 (Dkt. No. 14); see Baldwin v. Johnson, 152 F.3d 1304, 1311-12 (11th Cir. 1998) (assertion is insufficient). Therefore, Ogle has not met the cause and prejudice test.

A habeas petitioner's continued incarceration constitutes a "miscarriage of justice" when the petitioner is able to show "actual as compared to legal innocence." Calderon v. Thompson, 523 U.S. 538, 559 (1998); Bousley, 523 U.S. at 622; accord Clark v. Williams, 277 Fed. Appx. 973, 974-75 (11th Cir. 2008). The petitioner bears the burden of showing actual innocence. Bousley, 523 U.S. at 622. Ogle has made no such showing.

Because Ogle has met neither the cause and prejudice nor the miscarriage of justice test, this Court will not consider his claim regarding the *pro se* motion. Id. Therefore, Ogle's seventh argument that his appellate counsel provided ineffective assistance fails.


### 8. Failure to Subpoena Sales Receipt for Revolver

Ogle lastly contends that the revolver introduced into evidence at his trial was not the revolver used to commit the robbery, and that his appellate counsel's failure to present this argument on appeal constituted ineffectiveness. Because the state habeas court did not

address this issue, this Court reviews it *de novo*.  Cone,

129 S.Ct. at 1784.

According to Johnny Ogle, Teresa Ogle once owned a

silver-colored revolver with a four-inch barrel that was

chambered for .357 Magnum, manufactured by Smith & Wesson,

and equipped with black grips.  Habeas Petition at 11 (Dkt.

No. 1); H.T. 35-36, 249-50.  At some point, this handgun

malfunctioned, so Teresa Ogle sent it back to an

unspecified entity that then shipped a replacement revolver

to her.  H.T. 414-16.  The replacement revolver was a

silver-colored revolver with an approximately four-inch

barrel that was chambered for .357 Magnum, manufactured by

Taurus, and equipped with brown grips.  H.T. 413, 599.  The

two guns looked very much alike.  H.T. 34-36.  According to

Ogle, the Smith & Wesson revolver was used in the robbery,

but the Taurus was admitted at trial.  Habeas Petition at

11; H.T. 35.

Although Ogle's appellate counsel did not raise the

precise point upon which Ogle's present argument is based -

- i.e., that the wrong gun was admitted into evidence at

trial -- she did raise the related issue of the admitted

handgun's chain of custody.  Def.'s Br. on Dir. App. 6-7 (Dkt. No. 13 Ex. 4).  The Georgia Court of Appeals rejected the argument, noting that "[a] weapon is generally admissible if it is similar to the one used in the crime even though it is not conclusively shown to be the same one."  Ogle, 256 Ga. App. at 27-28 (citing Davis v. State, 272 Ga. 327, 330 (2000)); accord Williams v. State, 253 Ga. App. 458, 464 (2002).

The above-quoted language reveals that even if the gun admitted at trial was not the gun used in the robbery, its admission was not error because the admitted gun was undisputedly "similar" to the one used to rob the Quick Change.  H.T. 34-36; see H.T. 35-36, 249-50, 413, 599 (descriptions of both guns); see also Davis, 272 Ga. at 330 (above-quoted language).  Because admitting the gun was not error, Ogle's argument that admitting the wrong gun at trial warranted reversal lacks merit.

Because the argument was meritless, appellate counsel was not ineffective for failing to make it.  See Diaz, 402 F.3d at 1142 (counsel not ineffective for failing to raise

meritless argument).  Ogle's eighth argument that his
appellate counsel was ineffective fails.


III. CONCLUSION

Like Judge Moore, this Court concurs with the
Magistrate Judge with regard to the proper resolution of
Ogle's claims of ineffective assistance of trial counsel,
prosecutorial misconduct, and unfair factfinding by the
state habeas court.  See First Rpt. & Rec. (Dkt. No. 19);
Moore Order (Dkt. No. 23).  Accordingly, the Court adopts
the Magistrate Judge's first Report and Recommendation as
the opinion of this Court insofar as it addresses Ogle's
claims of ineffective assistance of trial counsel,
prosecutorial misconduct, and unfair factfinding by the
state habeas court.  (Dkt. No. 19).

As to Ogle's eight claims of ineffective assistance of
appellate counsel, this Order stands as the opinion of the
Court.  One of those eight claims is not properly exhausted
under § 2254(b)(1)(A).  The remaining seven lack merit.

When a habeas petition contains both exhausted and
unexhausted claims, it is a "mixed petition."  Burton v.

_Stewart_, 549 U.S. 147, 154 (2007).  Ordinarily, district courts should dismiss mixed petitions so that the petitioner may advance his unexhausted claims in the state habeas court, then return to federal court after exhausting them.  _Kelley v. Sec'y for Dep't of Corr._, 377 F.3d 1317, 1351 (11th Cir. 2004).  However, "[w]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, the district court can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as [providing] no basis for federal habeas relief."  _Ogle_, 488 F.3d at 1370.

Georgia's rules of procedural default bar a habeas claim not raised in the petitioner's "original or amended petition" unless the habeas judge finds cause for the petitioner's failure to raise the claim the first time.  O.C.G.A. § 9-14-51.  As discussed above, Ogle did not raise the seventh argument that his appellate counsel was ineffective -- i.e., the argument based on Ogle's _pro se_ brief -- before the state habeas court, and has not demonstrated cause for his failure to do so.  Under § 9-14-

51, therefore, "it is obvious that the unexhausted claim[]
would be procedurally barred in state court." See Kelley,
377 F.3d at 1351. Accordingly, this Court will treat
Ogle's seventh argument for the ineffectiveness of his
appellate counsel "as [providing] no basis for federal
habeas relief." Id.

As described in this order, none of Ogle's arguments
that his appellate counsel was ineffective warrant habeas
relief. As described in the Magistrate Judge's first
Report and Recommendation to Judge Moore, neither Ogle's
claim of ineffective assistance of trial counsel, nor his
claim of prosecutorial misconduct, nor his claim of unfair
factfinding by the state habeas court warrant habeas
relief. (Dkt. No. 19). Therefore, this Court **DENIES**
Ogle's habeas petition with prejudice. See Ogle, 488 F.3d
at 1371.

**SO ORDERED,** this ___29th___ day of June, 2009.

_____
HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA